

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FLAMINGO INDUSTRIES (USA) LTD. and )
ARTHUR WAH, )
                                )    No. 04 C 5673
               Plaintiffs, )
                                )    Suzanne B. Conlon, Judge
    v. )
                                  )
UNITED STATES POSTAL SERVICE, )
                                  )
               Defendant. )

## MEMORANDUM OPINION AND ORDER

Flamingo Industries (USA) Ltd. and Arthur Wah (collectively, "Flamingo") bring this bid

protest action against the United States Postal Service under 28 U.S.C. § 1491(b)(1) arising out of

the Postal Service's 1997 and 1998 solicitation for bids to manufacture mail sacks.[1] Flamingo

claims the bid solicitations and 1997 contract awards violated the Postal Service's purchasing

manual and various federal statutes. The Postal Service moves for summary judgment on the

administrative record.

## BACKGROUND

In a bid protest action, the court's review is limited to the administrative record before the

agency at the time of the challenged procurement decision. *Neals Janitorial Service v. United States*

*Dep't of the Navy*, 1998 U.S. Dist. LEXIS 465, at * 8 (N.D. Ill. Jan. 6, 1998). The Postal Service

---

[1]Count VII of the complaint is the sole remaining claim. *See Flamingo Indus. v. United
States Postal Service*, 302 F.3d 985 (9th Cir. 2002); *United States Postal Service v. Flamingo
Indus.*, 540 U.S. 736 (2004). This case was transferred to this court from the United States
District Court for the Northern District of California, pursuant to 28 U.S.C. §1406(a).

1

filed the administrative record and a statement of undisputed facts with references to the administrative record. Flamingo failed to respond to the Postal Service's statement of facts as required by Local Rule 56.1. Flamingo's failure to respond does not have the usual effect under Local Rule 56.1 because the court must limit its review to the administrative record. *See Davis v. Shalala*, 1995 U.S. Dist. LEXIS 1419, at **1-2 (N.D. Ill. Jan. 31, 1995). The court must independently examine the administrative record to determine whether the Postal Service's challenged procurement decisions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. *See WIT Assoc. v. United States*, 62 Fed. Cl. 657, 660 (2004).[2] Unless otherwise noted, the following facts are derived from the administrative record.

## I. The 1997 Solicitation

Flamingo is an Asian-American small business with an office in Elk Grove Village, Illinois. Arthur Wah is Flamingo's president and owner. In the past, Flamingo has supplied mail sacks to the Postal Service. AR Ex. 3, p. 2.[3] In March and May 1997, the Postal Service's Mail Transport Equipment ("MTE") office requested additional mail sacks because "sack inventories [had] reached a critical state." AR Ex. 1, 2. MTE's request stated "[i]f we are to have a successful peak mailing season this year, it is imperative we have these shipments begin 9/97." *Id.* In June 1997, the procurement office prepared a plan to purchase the requested mail sacks. AR Ex. 3. The plan listed

[2]The court looks to decisions from the United States Court of Claims and the United States Court of Appeals for the Federal Circuit because bid protest actions are most commonly litigated in those courts. Indeed, the Court of Claims has exclusive jurisdiction over bid protest actions filed after January 1, 2001. This action was originally filed in the United States District Court for the Northern District of California in 2000. *See Flamingo Indus. v. United States Postal Service*, 302 F.3d 985, 994 (9th Cir. 2002).

[3]Citations to the administrative record are designated as "AR" followed by the exhibit number and page, if applicable.

2

Flamingo as a past supplier of mail carrier bags. *Id.* at p. 2. The plan stated that "proposals will be evaluated for ability to ramp up to meet Sept 97 delivery requirements, past performance, and experience with same or similar production items in similar quantities. Pricing will be secondary to delivery capability." *Id.* at p. 5.

On June 11, 1997, the Postal Service issued a solicitation for polyprophylene mail sacks. AR Ex. 4. Several pages of the 1997 solicitation appear to be missing from the administrative record. For example, the table of contents appears incomplete and the section addressing evaluation and award factors appears to be missing. The procurement department evaluated seven offers from six different bidders in response to the 1997 solicitation. AR Ex. 7. Two of the suppliers, General Bag Corporation and the Osterneck Company, submitted offers to manufacture the bags in Mexico. AR Ex. 8, at p. 5-6. The contracting officer added 6% to the Mexican proposals. AR Ex. 8. The Mexican proposals were still lower than the domestic proposals even after the 6% price adjustment was made. AR Ex. 7, 8. The contracts were awarded to General Bag and Osterneck. AR Ex. 8. The contracting officer's evaluation and contract award determinations were reviewed and approved by a team leader and the manager of operational equipment. *Id.*

In September 1997, the Postal Service declared Flamingo to be in partial breach of its contract to provide mail carrier bags. AR Ex. 14. The Postal Service modified General Bag's contract to include some of the bags it had purchased from Flamingo. *Id.* The Postal Service saved $20,000 as a result of the modification. *Id.*

## II. The Limited Competition Solicitation

In September 1997, the procurement department issued a procurement plan for additional mail sacks to "support mailer demands and replenish inventories." AR Ex. 15. Flamingo was

identified as a prior supplier of the bags. *Id.* at p. 1. The plan stated that "MTE has indicated that available mail sack inventories have reached a critical state. In order to have a successful peak mailing season, it is imperative that delivery of these mail sacks begin in October 1997." *Id.* at p. 2. The plan stated further that "[l]imited competition will be utilized to meet the October 1997 delivery requirement as requested by MTE for this requirement. Proposals will be requested from the two current contractors . . . (General Bag Corporation and The Osterneck Company)." *Id.* at p. 4. As to Flamingo, the plan stated "[d]ue to performance problems . . . Flamingo Industries was not included in this process." *Id.* The plan was reviewed and approved by the contracting officer's team leader and the manager of operational equipment. *Id.* at p. 8. The plan requested a waiver of the requirement to publicize the solicitation due to an emergency. *Id.* at p. 7. The manager of "HQ Purchasing" approved the wavier. *Id.* at p. 8. Osterneck was awarded the business and its July 1997 contract was modified to include the additional bags. AR Ex. 16.

### III.     The 1998 Solicitation

On December 24, 1998, the Postal Service issued a solicitation for bids on additional mail sacks. AR Ex. 21. Certain portions of the 1998 solicitation appear to be missing from the administrative record. For example, the 1998 solicitation refers to attached drawings and specifications. *Id.* at p. 8. The administrative record does not contain the referenced drawings and specifications. However, Exhibit 24 contains a drawing and specifications from the 1998 solicitation. The specifications require the top edge of the mail bags to be selvedge. AR Ex. 24, Att. 3. A selvedge edge is woven like the cuff of a dress shirt. AR Ex. 37, p. 2. Flamingo and some other domestic producers do not have the flat weave equipment to create a selvedge edge. Flamingo uses a circular weave to create a heat cut edge. AR Ex. 24, 32.

4

The 1998 specification required the contract to be awarded on the basis of initial proposals received and without discussions. *Id.* at p. 42. It listed several evaluation factors. Although price was paramount, the contracting officer was required to consider each bidder's documented quality control system, plant, facilities and personnel resources, financial resources to support continued production, and acceptable record of past performance. *Id.* at p. 47. A best value determination was to be made considering all these factors. *Id.*

The 1998 specification contained a preference for domestic suppliers provision.[4] Under this provision, a 6% "proposal evaluation preference will be given to domestic-source end products. . . ." A domestic-source end product is an unmanufactured end product mined or produced in the United States or an end product manufactured in the United States; the cost of components produced or manufactured in the United States must exceed 50% of the cost of all its components. AR Ex. 21, p. 28. This provision also states:

> The contractor agrees that there will be delivered under this contract only domestic-source end products, except end products:
>
> (1) That the Postal Service determines are not mined, produced, or manufactured in the United States in sufficient and reasonably available commercial quantities and of a satisfactory quality;
>
> (2) For which the vice president of Purchasing and Materials determines that domestic preference is inconsistent with the interest of the Postal Service; or
>
> (3) For which the vice president of Purchasing and Materials determines the cost to the Postal Service to be unreasonable.

AR Ex. 21, p. 28. The 1998 solicitation required the contractor to submit a "Buy American Certificate." *Id.* at p. 46.

---

[4]The 1997 specification contained the same provision. AR Ex. 4 at p. 30-31.

The 1998 solicitation provided that the maximum period of performance for the contract was through March 31, 2002. *Id.* at p. 5. There is no evidence a contract has yet been awarded. Under the protest procedures in the Postal Service's procurement manual, the Postal Service delays awarding a contract pending a bid protest. § 3.6.5 of the purchasing manual.

## IV. The Purchasing Manual

The Postal Service publishes and maintains a purchasing manual that contains the Postal Service's purchasing policies. Some sections of the purchasing manual are included in the administrative record as part of the 1997 and 1998 solicitations. AR Ex. 4, 21. However, other relevant sections of the purchasing manual are referred to, but are not included as part of the administrative record. The 1997 and 1998 solicitations were both governed by the January 1997 purchasing manual. *See, e.g.,* AR Ex. 4, p. 24, Ex. 21, p. 23. The court reviewed the relevant sections of the 1997 purchasing manual on the Postal Service's website.

The January 1997 purchasing manual contains policies that apply to "all purchases of supplies, or services that involve the furnishing of supplies. Deviations may be authorized by the VP, Purchasing and Materials." § 1.7.12.b of the purchasing manual. The purchasing manual contains the following Buy American policy, which is at the heart of this dispute:

1.7.12 Buy American Policy

1.7.12.a Policy. **Postal Service policy is to give preference to domestic-source products and materials when purchasing supplies and services**. This policy is based on the Buy American Act (41 U.S.C. 10a-d). . . .

1.7.12.b. Supplies

\*       \*       \*

6

2. Definitions

(a) End Products. Articles, materials and supplies to be purchased for Postal Service use.
(b) Components. Articles, materials and supplies directly incorporated in end products.
(c) Domestic Source End Products. An unmanufactured end product mined or produced in the United States or an end product manufactured in the United States, if the cost of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components. . . .
(d) Foreign End Product. An end product other than a domestic-source end product.
(e) Domestic Proposal. A proposed price for a domestic-source end product, including transportation to destination.
(f) Foreign Proposal. A proposed price for a foreign-end product, including transportation to destination and duty. . . .

3. Requirement. **Only domestic-source end products may be purchased, except when the VP, Purchasing and Materials determines that:**

(a) The articles, materials or supplies are of a class or kind not mined, produced or manufactured in the United States in sufficient and reasonable available commercial quantities or satisfactory quality. . . ; or
**(b) Purchases of domestic-source end products would be inconsistent with the interest of the Postal Service, or that its cost would be unreasonable, as when the price comparison procedures described in 1.7.12.b.5 result in the purchase of a foreign end product.**

4.    Proposal Evaluation

(a) If award is to be based solely on price, the procedures discussed in 1.7.12.b.5 are used for price comparison.
(b) If performance evaluation factors will have a significant weight in proposal evaluation, domestic-source end products receive a preference in the case of closely ranked proposals, but no price comparison should be made.

5. Price Comparison. **Each foreign price proposal must be adjusted for purposes of evaluation by adding to the foreign proposal (inclusive of duty) a factor of six percent of that proposal.** If a tie results between a foreign proposal and a domestic proposal, the domestic proposal must be selected for award. When more than one line item is involved, the six percent evaluation factor is applied on an item-by-item basis. . . .

6. Solicitation Provision. Solicitations must include Provision 1-4, Buy American Certificate– Supplies.

7. Clause. Contracts must include Clause 1-9, Preference for Domestic Supplies.

(Emphasis added).  Other relevant sections in the purchasing manual include:

### 1.7.1 Competition

1.7.1.a Purchases valued at more than $10,000 (the competitive threshold) must be made on the basis of adequate competition whenever appropriate.  Adequate competition means the solicitation and participation of a sufficient number of qualified suppliers to ensure that the required quality and quantity of goods and services is obtained when needed, and that the price is fair and reasonable.
1.7.1.b Contracting officers, supported by such assistance as is necessary, must determine that adequate competition has been obtained in any instance in which it is required.  In making that determination, contracting officers must act with reasoned discretion, taking into account both the business requirements of the particular purchase and the Postal Service's general interest in identifying new suppliers and in providing opportunities for its supplier base.

### 1.7.2 Best Value

It is the policy of the Postal Service to award all of its contracts to the supplier offering the best value to the Postal Service.  The best value depends on the item being purchased, and is determined by the comparative analysis of proposals in accordance with the evaluation criteria of the solicitation and the business judgment of the contracting officer, with the assistance of the purchasing team.  In establishing and evaluating best value criteria, contracting officers and purchase teams make trade-offs among such matters as past performance, supplier capability, price, quality, life-cycle costs, risk, delivery terms and warranty terms.

### 3.2.1 Policy

3.2.1.a General.  It is the policy of the Postal Service to establish and maintain a strong, competitive supplier base that reflects the diversity of the American supplier community.  The Postal Service focuses on the entire business community for quality supplies and services that meet or exceed operational needs. . . .

3.2.1.b Supplier Diversity.  Supplier Diversity is the proactive business process that seeks to provide suppliers with equal access to purchasing opportunities.  It promotes supplier participation reflective of the American supplier community and encourages economic development. . . .

Postal Service supply contracts in excess of $10,000 are subject to the Walsh-Healey Public

Contracts Act, 41 U.S.C. §§ 35-35, except for "noncompetitive purchases justified by unusual or

compelling urgency (when delay would seriously harm the Postal Service)." §§ 9.5, 9.5.3 of the purchasing manual. Section 3.55 allows the Postal Service to award noncompetitive contracts when obtaining adequate competition for the purchase is not feasible or appropriate. This exception included situations where the delay of competitive bidding would seriously harm the Postal Service.

## V.    Flamingo's Protest

Flamingo protested the 1998 solicitation in accordance with the procedures set forth in §3.6 of the purchasing manual. AR Ex. 24. It contended the mail sack specifications were unduly restrictive of competition because American manufacturers lacked the capacity to produce the bags and therefore were denied the opportunity to compete. *Id.* Flamingo claimed the 1998 solicitation violated §§1.7.12, 1.8, 3.2.1 and 3.2.2.b of the purchasing manual, the domestic-source provision in the 1998 solicitation, and the Buy American Act, 41 U.S.C. § 10a-d. *Id.* Flamingo supplemented its protest with additional letters. AR Ex. 27, 28. The crux of Flamingo's bid protest was that the 1998 solicitation favored foreign producers because domestic producers do not have the flat weave equipment to produce a selvedge edge.

Several other manufacturers protested the 1998 solicitation as well. AR Ex. 25, 30, 32, 34. Conversely, numerous producers disputed Flamingo's claim that the mail bags could not be manufactured in the United States. AR Ex. 26, 33, 36, 44.

## VI.    Contracting Officer's Response

On February 24, 1999, the contracting officer submitted a statement to the General Counsel's office responding to the bid protests in accordance with § 3.6.7.e of the purchasing manual. AR Ex. 37. In response to the inadequate competition claim, the contracting officer submitted a chart showing nine proposals were received from eight different bidders. The contracting officer

9

determined the pool of bidders to provide adequate competition for the solicitation. AR Ex. 37 at p. 5.

In response to the claim that the 1998 solicitation violated the supplier diversity policy (§3.2.1 of the purchasing manual), the contracting officer pointed out that 50% of the bidders were minority and/or women-owned businesses. *Id.* at p. 6. In responding to the claim that the 1998 solicitation violated the Buy America policy, the contracting officer demonstrated that three proposals contemplated manufacturing the bags domestically. *Id.* The contracting officer provided additional evidence that the bags can be manufactured domestically. *Id.* The contracting officer concluded "USPS is not prohibited from buying bags from foreign firms if they are the only ones that can make the bags or that can compete on price." *Id.* at p. 7.

To rebut the protesters' claim that the specification was unduly restrictive, the contracting officer produced evidence that MTE had a rational basis for requiring a selvedge edge – a selvedge edge is stronger than a heat cut edge. AR Ex. 37, p. 8, Ex. 42, 43. The protesters claimed they should have been allowed to submit bags with alternative specifications. The contracting officer disagreed because MTE had an immediate need for the bags and did not want to delay a contract award to consider alternative proposals. AR Ex. 37 at. p. 10.

The protesters and the contracting officer submitted additional statements to the General Counsel in support of their positions. AR Ex. 38, 45. The contracting officer further explained the urgent need for mail bags. The Postal Service had less than 1 million mail bags in storage. AR Ex. 45, p. 3. Customers order hundreds of thousands of bags each week. *Id.* The procurement department had to ration the bags because of the shortage. *Id.*

10

## VII.  Senior Counsel's Decision

On May 6, 1999, the senior counsel for contract protests and policies issued a decision on the protests. AR Ex. 48.  He concluded that "[t]he protester's assertions that the specifications were revised with the intention to favor foreign sources are unsupported by evidence, and do not overcome the presumption that the government acts in good faith."  *Id.* at p. 3.  He determined that the contracting officer identified an acceptable basis for preferring sacks with a selvedge edge: "[i]t is clearly not unreasonable to prefer a manufacturing method that results in a stronger, smoother, and less abrasive sack."  *Id.* at p. 7.  He rejected the protesters' arguments that the solicitation violated the Buy American policy.  He concluded there is no requirement that specifications be tailored to encourage domestic sourcing and that the only domestic source preference applicable to the solicitation was the 6% price adjustment.  *Id.*  In addition, he rejected the protesters' argument that the 1998 solicitation resulted in inadequate competition because the contracting officer received numerous bids.  *Id.*

## VIII.  Flamingo's Sole Remaining Claim

The Ninth Circuit Court of Appeals held Flamingo had standing under 28 U.S.C. § 1491(b)(1) to assert its claim that the Postal Service's solicitation for bids violated the procurement manual.  *Flamingo Indus. v. United States Postal Service*, 302 F.3d 985, 994-95 (9th Cir. 2002).  This is the sole remaining claim.  *See id.; United States Postal Service v. Flamingo Indus.*, 540 U.S. 736 (2004); November 22, 2004 Order, Dkt. No. 19.

Section 1491(b)(1) provides for district court jurisdiction over any claim by an interested party "objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in

11

connection with a procurement or a proposed procurement." Flamingo objects that the 1997 contract awards to General Bag and Osterneck and the 1998 solicitation for bids violate the Buy American policy, the affirmative action policy, environmental regulations and other procurement manual provisions. *See* Complaint, ¶¶ 57-66. Flamingo seeks damages, declaratory and injunctive relief, including a permanent injunction barring the Postal Service from violating the purchasing manual. The Postal Service moves for summary judgment on the administrative record with respect to this sole remaining claim.

## DISCUSSION

### I. Jurisdiction

A district court may review a bid protest by an interested party objecting to a solicitation by a federal agency for bids or proposals for a proposed contract or to the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. 28 U.S.C. § 1491 (b). The Administrative Dispute Resolution Act of 1996, Publ. L. No. 104-320, 110 Stat. 3870, 3874-76 (ADRA), vested the Court of Federal Claims and district courts with concurrent jurisdiction over bid protest actions. 28 U.S.C. § 1491(b)(1). Pursuant to the ADRA's sunset provision, however, district court jurisdiction terminated on January 1, 2001. Now, the Court of Federal Claims has exclusive jurisdiction over bid protests. This case was filed in the United States District Court for the Northern District of California in 2000, and was transferred to this court in August 2004. *Flamingo Indus. v. United States Postal Service*, 2004 U.S. Dist. LEXIS 17530 (N.D. Cal. Aug. 23, 2004). When this case was filed, the district court properly exercised jurisdiction and continues to do so. *Flamingo Indus.*, 302 F.3d at 994.

12

## II.    Standard of Review

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *King v. National Human Resource Committee, Inc.*, 218 F.3d 719, 723 (7ᵗʰ Cir. 2000). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying evidence that demonstrates the absence of a genuine issue of material fact. The non-moving party must then come forward with evidence and designate specific facts that establish there is a genuine triable issue. *Selan v. Kiley*, 969 F.2d 560, 564 (7ᵗʰ Cir. 1992). A genuine issue of material fact exists when the evidence would support a reasonable jury verdict for the non-moving party. *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7ᵗʰ Cir. 2000). In a bid protest action, the court examines the administrative record to determine whether any genuine issues of material fact exist and whether the moving party is entitled to a judgment as a matter of law. *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

## III.    Analysis

A bid protest proceeds in two steps. The court first determines whether the government acted without rational basis or contrary to law when soliciting and evaluating bids and awarding contracts. *Bannum, Inc. v. United States*, 2005 U.S. App. LEXIS 6815, at * 7 (Fed. Cir. April 21, 2005). In making this determination, the court considers whether the agency's procurement decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.* at *8. The agency's failure to follow the terms of its own solicitation or procurement manual is a quintessential example of arbitrary and capricious conduct. *Hunt Building Co., Ltd. v. United States*,

13

61 Fed. Cl. 243, 263 (2004); *Concept Automation, Inc. v. United States*, 41 Fed. Cl. 361, 367, 369 (1998). If the court finds the government acted without rational basis or contrary to law, it next determines if the bid protester was prejudiced. *Bannum*, 2005 U.S. App. LEXIS 6815, at *8. To establish prejudice, a claimant must show there was a substantial chance it would have received the contract award but for that error. *Galen Medical Assoc., Inc. v. United States*, 369 F.3d 1324, 1329-30 (Fed. Cir. 2004). Even if a contract award violates a regulation or procedure, a claimant cannot prevail unless it was prejudiced by that violation. *Id.* at 1330-31; *Admerasia, Inc. v. United States Postal Service*, 2004 U.S. Dist. LEXIS 7225, at * 25 (S.D.N.Y. April 26, 2004).

The court must independently address any legal issues, such as the correct interpretation of a solicitation or manual provision, and then determine whether the agency decision lacked a rational basis or involved a prejudicial violation. *Galen*, 369 F.3d at 1329-30. In cases where an agency rendered a bid protest decision, the court reviews the agency's underlying procurement decision, not the bid protest decision. *Advanced Data Concepts, Inc. v. United States,* 43 Fed. Cl. 410, 416 (1999). However, deference must be given to the bid protest decision. *Id.* Where a bid evaluation is challenged, the court must examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations. *Galen*, 369 F.3d at 1330.

### A.    The 1997 Contract Awards

Flamingo claims the Postal Service's 1997 contract awards to General Bag and Osterneck violated the Buy American, domestic preference and affirmative action policies set forth in the purchasing manual and 1997 solicitation.

14

### 1. Buy American and Domestic Preference Policies

The parties agree the General Bag and Osterneck mail sacks are foreign-source end products. Both the Buy American and domestic preference provisions require the Postal Service to purchase domestic-source end products unless it determines that domestic-source products are unavailable, or the vice president of purchasing and materials determines that domestic preference is inconsistent with Postal Service interests, or that the cost of domestic-source end products is unreasonable. AR Ex. 4, p. 30-31; § 1.7.12.b.3 of the purchasing manual. The Buy American policy states that price is unreasonable when "the price comparison procedures described in 1.7.12.b.5 result in the purchase of foreign end product." § 1.7.12.b.3 of the purchasing manual. Section 1.7.12.b.5 requires the Postal Service to add 6% of the proposal price to foreign price proposals. § 1.7.12.b.5 of the purchasing manuel. The contracting officer complied with this provision by adding 6% to the foreign proposals. AR Ex. 7. The foreign proposals were still cheaper than any of the domestic proposals. AR Ex. 7, 8. The Postal Service correctly applied the 6% price adjustment.

This finding does not end the court's inquiry. The Buy American and domestic preference policies require the Postal Service to purchase domestic-source end products unless certain determinations are made. §1.7.12.b.3 of the purchasing manual; AR Ex. 4, at p. 30-31. There is no evidence the Postal Service determined domestic-source products were unavailable. Indeed, the contracting officer received proposals to manufacture the mail bags domestically. Nor is there any evidence the *vice president of purchasing and materials* determined the purchase of domestic-source products was inconsistent with Postal Service interests or that the cost of domestic-source products was unreasonable. Thus, there may have been a technical violation of the domestic preference and Buy American provisions if the *vice president* did not make the required determination. The court

must determine whether this possible violation prejudiced Flamingo. Neither party's brief addresses this precise issue.

Even if the vice president failed to make the Buy American determination, Flamingo has not shown it was prejudiced by that technical violation. To establish prejudice, Flamingo must show that the vice president would not have made the Buy American determination and that Flamingo would have had a substantial chance of winning the contract. There is no evidence to support either of these conclusions. First, the Buy American policy clearly provides that the cost of domestic products is unreasonable if foreign products are cheaper than the domestic products even after the 6% price adjustment is made. § 1.7.12.b.3 of the purchasing manual. General Bag and Osterneck's foreign proposals were cheaper than any of the domestic proposals even after the 6% price adjustment. AR Ex. 7. This evidence suggests the domestic proposals were unreasonable as a matter of course under the Buy American policy. § 1.7.12.b.3 of the purchasing manual. Moreover, the contracting officer's evaluation and contract award decisions were reviewed and approved by both a team leader and the manager of operational equipment. AR Ex. 8. Flamingo offers no evidence to support a conclusion that the vice president of purchasing and materials would not have made a Buy American determination under these circumstances.

Second, Flamingo has not shown it had a substantial chance of receiving the contract even if General Bag and Osterneck's foreign proposals were rejected. The 1997 contracts were not awarded on price alone. The contracting officer considered production capacity, delivery capability, and past performance. AR Ex. 8, p. 3. In evaluating the proposals, the contracting officer noted that "Flamingo is currently at full capacity and is behind schedule on both current contracts. . . . In view of Flamingo's delivery status on its current contracts, Flamingo poses a high risk to performance in

16

view of the critical need of the mail sacks." AR Ex. 8, p. 4. Flamingo offers no evidence that the contracting officer acted unreasonably or irrationally in making these findings. Moreover, Flamingo did not bid for all the line items and did not have the capacity to produce all the bags requested in the solicitation. AR Ex. 8 at p. 4. This evidence suggests Flamingo would not have received the contract even if the foreign proposals were rejected. Flamingo presents no conflicting evidence. In sum, assuming there was a technical violation of the Buy American policy because the vice president failed to make the required determination, there is no evidence Flamingo was prejudiced as a result.

Flamingo argues that the Postal Service violated the Buy American policy when it partially terminated Flamingo's contract in 1997 and ordered the bags from General Bag instead. Flamingo claims the Postal Service failed to apply the 6% price differential required under the Buy American policy. Flamingo's argument misses the mark because the Postal Service applied the 6% price differential when it awarded General Bag the 1997 contract. The Postal Service merely modified the existing contract to order additional bags. There is no evidence the modification violated the purchasing manual.

## 2. Supplier Diversity Policy

Flamingo claims the 1997 contract awards also violated the Postal Service's affirmative action policy. Flamingo fails to identify particular purchasing manual or solicitation clauses it claims were violated by the 1997 contracts. Presumably, Flamingo refers to § 3.2 of the purchasing manual, Supplier Diversity. The purpose of those provisions is to ensure that "no suppliers are excluded from competition on the basis of race, color, religion, sex, age or national origin." § 3.2.1.b of the purchasing manual. The policy does not require contracts to be awarded to minority businesses. The

17

administrative record reflects that three of the six proposals received in response to the 1997 solicitation were from minority or women-owned businesses. AR Ex. 8, p. 10. Thus, minority firms were well represented in the bidding process. Flamingo fails to present any evidence that the 1997 solicitation or contract awards violated the supplier diversity policies.

### 3. Conclusion

Summary judgment must be granted for the Postal Service on the administrative record because, even assuming a technical violation of the Buy American and domestic preference policies, there is no evidence Flamingo was prejudiced. Moreover, there is no other evidence the 1997 contract awards were irrational or otherwise contrary to law.

### B. The 1997 Limited Competition Award

Flamingo argues the 1997 limited competition award violated the purchasing manual and the Walsh-Healey Public Contracts Act, 41 U.S.C. §§ 35-45. According to Flamingo, the Postal Service declared a false emergency for mail sacks in order to avoid publicly announcing the solicitation. Flamingo offers absolutely no evidence to support this argument. Flamingo's mere suspicion and innuendo are insufficient to create factual issues regarding the Postal Service's conduct in the procurement process. *Admerasia, Inc. v. United States Postal Service*, 2004 U.S. Dist. LEXIS 7225, at *22 (S.D.N.Y. April 26, 2004).

The undisputed evidence shows the 1997 limited competition award complied with the purchasing manual. The purchasing manual explicitly exempts emergency purchases from public announcement. §§ 3.5.3.a.1, 9.5.3 of the purchasing manual. The contracting officer determined that the need for mail bags was "critical" and requested a waiver of the public announcement requirement pursuant to § 3.5.3.a.1 of the purchasing manual. AR Ex. 15. The waiver was

18

approved. *Id.* There is no evidence suggesting the contracting officer's determination that there was a critical need for mail bags was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Accordingly, summary judgment must be granted for the Postal Service with respect to the 1997 limited competition award.

### C.   The 1998 Solicitation

Flamingo claims the 1998 solicitation is unduly restrictive and violates numerous purchasing manual provisions and federal statutes.

### 1.   Unduly Restrictive

Flamingo claims the 1998 specification requiring a selvedge top edge is unduly restrictive because it excludes domestic suppliers. Flamingo argues it should have been allowed to submit an alternative proposal that deviated from the specification. The Postal Service responds that it had a rational basis for requiring a selvedge edge and did not have time to consider alternative specifications. The administrative record amply demonstrates a rational basis for the changed specification: a selvedge edge was determined to be stronger than a heat-sealed edge. AR Ex. 37, p. 8, Ex. 43. Mailers typically hang open bags on mail racks by metal hooks to load and unload mail. AR Ex. 37, at p. 8. Because the mail bags are reused, durability is important. *Id.* The court's role is not to second-guess procurement decisions. Rather, the court must review the administrative record to determine only whether procurement decisions are arbitrary, capricious, an abuse of discretion or otherwise contrary to law. *T&S Products, Inc. v. United States*, 48 Fed. Cl. 100, 104 (2000). There is ample evidence supporting the Postal Service's 1998 specification. The decision to change the specification was not arbitrary or capricious.

## 2. Buy American Policy

Flamingo argues the Postal Service "deliberately changed its specifications, so that U.S. factories could not produce plastic mail bags according to their specifications" in violation of the Buy American policy. Response, at 3. The evidence directly refutes this argument. The undisputed evidence shows domestic factories can produce mail bags in accordance with the 1998 specification. AR Ex. 31, Ex. 33, Ex. 36. Indeed, three of the eight proposed suppliers domestically manufacture the bags. AR Ex. 37, Att. 1. Accordingly, there is no evidence the 1998 specification is unduly restrictive or that it violates the Buy American policy by excluding domestic producers.

Flamingo argues it should have been allowed to submit a bid with different specifications. The solicitation did not allow proposals with alternative specifications. The Postal Service had an immediate need for the bags and could not delay a contract award to consider alternative specifications. AR Ex. 37, p. 10. Given the immediate need for bags, the Postal Service did not act arbitrarily or capriciously in refusing to consider proposals with alternative specifications.

## 3. Supplier Diversity Policy

Flamingo also suggests the 1998 solicitation violated the Postal Service's affirmative action policy. Presumably, Flamingo refers to the supplier diversity policies. The purpose of the supplier diversity policies is to ensure that "no suppliers are excluded from competition on the basis of race, color, religion, sex, age or national origin." § 3.2.1.b of the purchasing manual. The undisputed evidence shows that four of the eight bidders were minority and/or women-owned businesses. AR Ex. 37, p. 6, Att. 1. There is no evidence the 1998 solicitation violated the Postal Service's supplier diversity policies.

### 4. Miscellaneous Violations

Without citing any evidence, Flamingo argues the bags produced in Mexico violate environmental regulations. Additionally, Flamingo claims the 1998 solicitation violates numerous other purchasing manual policies and federal statutes without citing any evidence or even explaining this generalized claim. Flamingo merely lists the provisions and statutes. Flamingo has waived these arguments by failing to develop them in response to summary judgment. *Baxter v. Trinity Servs.,* 2004 U.S. Dist. LEXIS 17980, at *22-23 (N.D. Ill. Sept. 3, 2004). Moreover, the court has carefully reviewed the administrative record. There is no evidence of inadequate competition. § 1.7.1 of the purchasing manual. Indeed, the Postal Service received eight offers. AR Ex. 37, Att. 1. Nor is there any evidence that the contracting officer violated the best value policy. §1.7.2 of the purchasing manual.

### 5. Conclusion

There is no evidence the Postal Service acted irrationally or contrary to law when it changed the specification for mail bags and issued the 1998 bid solicitation. Summary judgment must be granted for the Postal Service on the administrative record with respect to this claim.

### D. Breach of Good Faith and Fair Dealing

Flamingo argues there are issues of fact regarding the Postal Service's breach of its duty to cooperate in good faith in connection with Flamingo's delivery of mail bags. Count VII is the sole remaining claim. The court's jurisdiction over Count VII, pursuant to 28 U.S.C. § 1491(b)(1), allows an interested party to challenge a federal agency's procurement decision, not a breach of contract or duty of good faith and fair dealing. *See Flamingo Indus.*, 302 F.3d at 994. Flamingo

21

cannot avoid summary judgment by pointing to alleged issues of fact regarding the Postal Service's purported breach of good faith and fair dealing.

## CONCLUSION

The court has carefully examined the administrative record. There are no factual issues precluding summary judgment for the Postal Service.

May 12, 2005                                    ENTER:


Suzanne B. Conlon
United States District Judge